Hazel Armstrong, Administratrix of the Estate of George J. Armstrong, Deceased, Appellee, v. Chicago & Western Indiana Railroad Company and Chicago & Eastern Illinois Railway Company, Appellants.

Gen. No. 34,680.

128

Opinion filed October 21, 1931. Rehearing denied November 2, 1931.

EDWARD W. RAWLINS, DONALD B. CRAIG, FRED H. KELLY, JAMES W. CRAIG, JR. and JAMES CRAIG VAN METER, for appellants; KENNETH L. RICHMOND and JOHN F. CONNORS, of counsel.

JOSEPH D. RYAN, for appellee; FRANK JOHNSTON, JR., of counsel.

MR. PRESIDING JUSTICE HEBEL delivered the opinion of the court.

This is an action of trespass on the case brought by the plaintiff, Hazel Armstrong, administratrix of the estate of George J. Armstrong, deceased, against the defendants, Chicago and Western Indiana Railroad Company, a corporation (hereinafter referred to as C. & W. I. R. R. Co.), and Chicago and Eastern Illinois Railway Company, a corporation (hereinafter referred to as C. & E. I. Ry. Co.), to recover damages under the Federal Employers' Liability Act, Cahill's St. ch. 114, ¶ 321 *et seq.*, on account of the death of George J. Armstrong from injuries sustained by him

while in the employ of the C. & E. I. Ry. Co., in what is commonly called the 83rd street yards of the C. & W. I. R. R. Co. at Chicago, Illinois, on the 15th day of August, A. D. 1928.

The case was tried and a verdict of $30,000 was rendered against the defendants. After motions for a new trial and in arrest of judgment were made and overruled, judgment was entered against the defendants for the amount of the verdict. This appeal is by both defendants.

The declaration in this case consists of three counts. The first count, in substance, alleges that on the 15th day of August, 1928, the defendants were in possession and control of and operating as common carriers by railroad various lines of steam railroad in and through the City of Chicago, county of Cook and State of Illinois, and divers other States of the United States, and on said date were engaged in interstate commerce; that at said time plaintiff's intestate, George J. Armstrong, was employed by and was at work for the C. & E. I. Ry. Co., one of the defendants, in such interstate commerce as a switchman and conductor, and, in due course of his employment, was engaged in moving divers freight cars in interstate transportation to and through a certain yard and premises known as the 83rd street yard in the City of Chicago, which said yard and premises were then and there owned, operated and controlled by the first above named defendant, C. & W. I. R. R. Co.; that said defendant allowed, permitted and authorized the C. & E. I. Ry. Co., one of the defendants, to operate cars, engines and trains upon and over the said railroad aforesaid, and by virtue of said right so granted by the C. & W. I. R. R. Co. defendant, to the C. & E. I. Ry. Co., defendant, the C. & E. I. Ry. Co. became and was the agent of the C. & W. I. R. R. Co.; that said defendant became liable for the negligent acts of the agents,

servants and employees of the C. & E. I. Ry. Co. under
the laws of the State of Illinois and the Federal Em-
ployers' Liability Act; that it was the duty of the
defendants to furnish the plaintiff's intestate with
a reasonably safe place to work and to use reasonable
care to furnish him in the nighttime while it was dark,
a clear track free from dangerous obstructions; that
on the said date in the nighttime and while it was dark,
plaintiff's intestate was lawfully engaged with other
servants of the said C. & E. I. Ry. Co., defendant, in
switching, moving and propelling said freight cars
upon and along a certain lead or running track in said
yard; that the said defendants neglected to furnish
the plaintiff's intestate with a reasonably safe place
to work, and failed and neglected to keep the running
track free from dangerous obstructions, and in the
nighttime while it was dark, negligently allowed and
permitted certain unloaded freight cars to be in, upon
and in close proximity to said lead or running track;
that while the plaintiff's intestate was engaged in the
due course of his employment, and while he was stand-
ing or stationed upon the end of the car or caboose
which was being pushed and propelled, said end car
or caboose came into violent contact and collision with
the said cars, which were allowed and permitted to be
upon and in dangerous proximity to said track, by
reason of the negligence of the defendants, and as a
direct result plaintiff's intestate sustained physical
injuries which resulted in and caused his death.

The second count is like the first, except that instead
of relying upon the alleged duty of both defendants
to furnish plaintiff's intestate a safe place to work,
said count alleges: first, that the C. & W. I. R. R. Co.
allowed unloaded cars to stand on its tracks, making
it unsafe; and second, that the C. & E. I. Ry. Co. failed
to furnish a clear track by permitting cars to be on
the track; and third, that the C. & E. I. Ry. Co. could

have, by the exercise of due care, discovered the cars in time to warn the plaintiff's intestate.

The third count is like the first, except that instead of relying upon the failure of the defendants to furnish a safe place to work, it alleges that:

"(1) The Chicago & Western Indiana Railroad Company owned and used the yards in question for storage purposes; that cars in the yards if not braked, would roll down hill, fouling the running track; that these facts were not known or appreciated by plaintiff's intestate; that the yard was unlighted; that the Chicago & Western Indiana permitted cars to stand on tracks without the brakes being set; that by reason of the negligence of the Chicago & Western Indiana the cars rolled down hill and fouled the running track.

(2) The Chicago & Western Indiana permitted and signaled plaintiff's intestate to use the running track.

(3) The Chicago & Eastern Illinois Railway Company negligently required Armstrong to move cars upon the running track and over an unlighted yard without taking any reasonable precaution to render the track safe.

(4) All of this would have been known to the Chicago & Eastern Illinois Railway Company if it had used reasonable care to furnish a safe place to work.

(5) While riding on the end car, plaintiff's intestate came into contact with cars or obstructions aforesaid, and received the injuries resulting in his death."

After overruling the general and special demurrer filed by the defendants to each and all of the counts of the declaration, the defendants filed the general issue and several special pleas denying ownership and operation, setting up that the accident was caused by the sole negligence of the plaintiff's intestate and alleging that the plaintiff's intestate assumed the risk. The defendants did not introduce any evidence at the close of the plaintiff's case.

The facts offered by the plaintiff are, substantially, that the said George J. Armstrong was a freight conductor, who had been in the employ of the C. & E. I. Ry. Co. for about eight years prior to his fatal injury; for about two years prior to that time he had been working on the same run and had been in charge of the same crew, making deliveries to the same yard at night just as he was doing on the night in question. Armstrong was 37 years of age and in good health at the time of the accident; had perfect hearing and eyesight; had never had any serious accident or injury; he earned about $200 a month, and left surviving him the plaintiff, his wife, and one minor daughter, both of whom he supported from his earnings; that at about 11:30 p. m. on the 14th day of August, 1928, Armstrong, together with his crew, left Yard Center, which is several miles south of the place where the accident happened, for the purpose of carrying out several switching operations. The crew consisted of the engineer, S. I. Miller, who testified in the case; the fireman, Evers; the conductor George J. Armstrong; the head brakeman, D. Hornaday, who died prior to the trial, and the rear brakeman, F. Gibbons. When the train left Yard Center it headed approximately north. It consisted of a locomotive engine, tender, 35 freight cars and one caboose. The engine was Terminal No. 1802, capable of handling 100 cars. The cars in the train averaged about 40 feet in length. Seven cars of the 35 were left at the C. R. I. & P. yards at Oakdale. The engine then moved in a northerly direction, with 28 cars and the caboose on the freight main track No. 4 of the C. & W. I. R. R. Co., known as the Dalton branch. Sixteen cars were designated for delivery to the Belt Railroad at 89th street, and 12 to the C. & W. I. R. R. Co. at the 83rd street yards. Before the train came into the 83rd street yard, rear brakeman Gibbons dropped off while

the train was going north, to line the switches for the Belt yard. The train proceeded north, and then northeast beyond 83rd street, crossing the interlocking plant at 80th street, and proceeded northeast on Belt track No. 2, until the whole cut of the 28 cars and the caboose were north of the switch located immediately south of 80th street and leading down into the running track in the 83rd street yards of the C. & W. I. R. R. Co., so that the whole train could proceed to the south on the running track. After the train cleared the switch, the crew were given signals by the switch tender to push the train back on the running track, and the train backed in a southerly direction down the running track. This running track ran south from 80th street along the west side of the 83rd street yards of the C. & W. I. R. R. Co. under the viaduct where the accident happened, and on down to the Belt yards. There were about 23 storage or delivery tracks in the yards, running north and south. One of the storage tracks was known as No. 8, one as No. 9, one as No. 10, one as No. 11, etc., the highest numbered track being farthest east. A yard lead track extended from the running track near its north end connecting with certain of the storage tracks, including track No. 8. There was a switch where the yard lead connected with the running track and switches at the different places where the storage tracks started off the yard lead. Near the south end of the running track two lead tracks connected the storage tracks with the running track. One of them, which connected with storage track No. 8 joined the running track just under the viaduct where the accident occurred at 87th street. The running track, switch track and yards belonged to the C. & W. I. R. R. Co. and the train was being operated by the C. & E. I. Ry. Co., and Armstrong and the other members of the train crew were employees of the C. & E. I. Ry. Co. The

train being moved by Armstrong and his crew, contained cars loaded with interstate freight, so that at the time of his fatal injury Armstrong was engaged in interstate commerce.

After Armstrong's train entered the C. & W. I. R. R. Co. yard, it backed south on the running track until the caboose and the 16 cars to be delivered to the Belt road were clear of the yard lead switch which connected with track No. 8. Hornaday, the head brakeman, handled the yard lead switch and gave the signals to the engineer when he was backing on the running track. The engine and the 12 remaining cars were then disconnected, pulled north until they cleared the yard lead switch, and the 16 cars and the caboose were left on the running track. The head brakeman threw the yard lead switch, gave the engineer a signal to back up, and the engine and the 12 cars backed down the lead track. Armstrong then threw the switch where track No. 8 joined the yard lead, and signaled the engineer to come on back, and the 12 cars moved back from the lead into track No. 8. As the cars moved backward the head brakeman was hanging on the side of one of the cars near the rear end of the cut with his lantern. When the car which he was on reached the place where Armstrong was standing, he dropped off. After the 12 cars had been backed part way into track No. 8, the train barely moved, and as the train had gone about 8 or 9 car lengths the engineer felt a slight jar upon the engine; that he the engineer got a signal from Armstrong to move backward. Armstrong then was standing about four car lengths south of the switch, which allowed the cars to go back from the lead onto storage track No. 8. He gave the engineer a signal to keep backing, and he continued backing four car lengths and the length of the engine, or until the north end of the engine was about 30 feet south of the switch from the lead into

track No. 8. Armstrong then signaled the engineer to stop, and then he gave a signal to the head brakeman to cut the engine off from the cars, which was done. At the time of this switching operation a number of cars were on track No. 8. Armstrong then signaled the engineer to go ahead. The engine went north on the lead to the running track, then on Armstrong's signal, backed south on the running track connected with the 16 cars and caboose which had been left standing there. Armstrong walked straight west to the caboose and got on it. He was the only man on this car. Armstrong gave a signal to the engineer from the caboose to back down the running track, and the engine and 16 cars backed down the running track at a speed of 10 or 12 miles an hour. The next thing the engineer knew was that he felt a collision when the caboose was directly under the viaduct, and of his own volition put on the air. No signal was given at any time by Armstrong, and he made no attempt in any way to stop the train. The engineer then left his engine and walked back and found under the viaduct that the cars had come out from the north on track No. 8, and had fouled the running track; that there were about 1½ cars which were squarely on the running track, so that as the cars in charge of conductor Armstrong backed down, they backed squarely into the middle of the second car from the south, which came down on track No. 8 and fouled the running track under the viaduct at 86th street. Under the viaduct on the outside of the track, there were two lighted switches, one at the north end and one at the south end. They were lined green, indicating clear for the running track. Four cars and the caboose were derailed, and Armstrong was injured. He never regained consciousness, except for a very few seconds, and was taken to the hospital and died there shortly after the accident.

The weather on the night of the accident was fair—a little haze was lying next to the ground. The yards were not lighted.

There is evidence that the yard is a gravity yard, and also that there was a uniform established practice and custom relative to braking or anchoring cars that were placed on these tracks in the yard in question; that bulletins were posted by the superintendent over his signature about braking cars and having brakes placed upon these cars; and that orders were also issued by the yardmaster relative to the necessity of anchoring and blocking cars upon the switch tracks in this yard.

For the purpose of the record the defendants stipulated, in substance, as follows:

"That, in the train handled by the plaintiff's intestate on the night in question there were cars which contained interstate freight, that is, cars which had come out of the state and cars which were consigned and intended to go out of the state; that in the train of 12 cars shoved on track 8, there were cars of interstate character; and also that the track upon which the 12 cars were set in that had been referred to as No. 8, and the running track upon which they were moving at the time of the accident were tracks belonging to the defendant, the C. & W. I. R. R. Co., and it owned the tracks and yards."

It is urged by the defendants that the trial court should have directed a verdict for the defendants in this case for the reason that the evidence failed to show any negligence on the part of either defendant, but that it did show that the fatal injury was caused by Armstrong's own negligence.

They further contend that in order to establish liability under the Federal Employers' Liability Act, Cahill's St. ch. 114, ¶ 321 *et seq.*, it is necessary for the plaintiff to establish that the C. & E. I. Ry. Co., Armstrong's employer, or its servants, were guilty of

some negligence as alleged in the declaration, which in whole or in part caused the fatal injury. The kind or amount of evidence necessary to establish negligence is determined by the common law as construed by the federal courts, and the United States Supreme Court has often announced that mere proof of a defective condition and the happening of an accident is not sufficient to establish negligence, and unless the plaintiff produces evidence from which an inference may reasonably be drawn that the injury suffered was caused by the negligent act of the employer, there can be no recovery, and the case must be withdrawn from the jury. To this contention, the plaintiff replies that she does not contend that the relationship of master and servant between the defendants is created by the common law doctrine of master and servant, but that the relationship arises by reason of the Illinois statutes as construed by the Supreme Court, and that since by statutory construction Armstrong was the employee, or servant of both of the defendants at the time he was fatally injured, and since he was actually engaged in interstate commerce at that time, it follows that there is a joint liability of the defendants under the Federal Employers' Liability Act, provided that the evidence shows that either of the defendants was guilty of negligence or that both of them were guilty.

The authority of the C. & W. I. R. R. Co. to enter into an agreement with the C. & E. I. Ry. Co. for the use of its tracks and switching facilities in the 83rd street yard was granted under the provision of paragraph 61 of chapter 114 of Cahill's Ill. Stats. in these words:

"That all railroad companies incorporated or organized under, or which may be incorporated or organized under the authority of the laws of this State, shall have power to make such contracts and arrangements with each other, and with railroad corporations

of other States, for leasing or running their roads, or any part thereof; and also to contract for and hold in fee simple or otherwise, lands or buildings in this or other States for depot purposes; and also to purchase and hold such personal property as shall be necessary and convenient for carrying into effect the object of this Act.''

This provision of the statute has been construed by our Supreme Court to the effect that a grant or franchise to operate a railroad imposes a duty in the use and operation of its property as a railroad to do no unnecessary damage to the person or property of others, and when injury results from negligent or unlawful operation, whether by the corporation operating under the franchise, or by another corporation, or by individuals whom the owner authorizes or permits to use its tracks, the owner, as well as the user, will be liable, and the company which is permitted to use said tracks will be regarded as the servants and agents of the owner company.

In the case of *Pennsylvania Co. v. Ellett,* 132 Ill. 654, in passing upon this rule just referred to, the court uses these words:

''The law has become settled in this State, by an unbroken line of decisions, that the grant of a franchise, giving the right to build, own and operate a railway, carries with it the duty to so use the property and manage and control the railroad as to do no unnecessary damage to the person or property of others; and where injury results from the negligent or unlawful operation of the railroad, whether by the corporation to which the franchise is granted, or by another corporation, or by individuals whom the owner authorizes or permits to use its tracks, the company owning the railway and franchise will be liable. . . . While the company guilty of the negligence,—in this case, the Pennsylvania Company—will be liable for the damages resulting therefrom, the

owner of the railroad to whom is granted the control and management of it will also be liable. The public may look for indemnity for injury resulting from the wrongful or unlawful operation of the road, to that corporation to which they have granted the franchise, and thus delegated a portion of the public service; and for this purpose the company whom it permits to use its tracks, and its servants and employee, will be regarded as the servants and agents of the owner company." This construction has been applied and sustained by the Supreme Court in the following cases: *Chicago and Erie R. Co. v. Meech*, 163 Ill. 305; *West Chicago Street R. Co. v. Horne*, 197 Ill. 250; *Chicago and Grand Trunk R. Co. v. Hart*, 209 Ill. 414; *Chicago & E. I. R. Co. v. Schmitz*, 211 Ill. 446.

It has also been held that the lessor and the lessee of a railroad track are not only jointly and severally liable to the general public, but that the rule applies also to the employees of the lessee. *Chicago & Grand Trunk R. Co. v. Hart, supra.*

The question to be considered is: Are the defendants liable under the Federal Employers' Liability Act, and did the plaintiff establish the guilt of the C. & E. I. Ry. Co. for the negligence of its servants as alleged in the declaration, which in whole or in part caused the fatal injury to the plaintiff's intestate?

The facts show that the switch tender employed by the C. & W. I. R. R. Co. controlled operation by signals, and that the C. & E. I. Ry. Co. train was directed and permitted to enter the yards of the C. & W. I. R. R. Co. and to use the switching facilities where the accident occurred. The C. & E. I. Ry. Co. voluntarily placed its engine and cars at the place and under the control and direction of the C. & W. I. R. R. Co., and for the time being, and for the purpose of switching, the switch tender of this road became the employee of the C. & E. I. Ry. Co. Therefore, under the rule of the Supreme Court, he became the employee of these de-

fendants. This conclusion is fully sustained in the case of *Wabash, St. Louis and Pac. Ry. Co. v. Peyton,* 106 Ill. 534, wherein the court says:

"Again, this company was held to care for the safety of all persons whilst exercising its franchises, whether on its road or the road of another. This was the duty imposed by law when it received its franchises, and the duty inheres whenever the company exercises them. This is a duty that attaches at all times, and at all places where the company operates its road. It was, then, the duty of appellant, by its servants, to see and know that the track was in good and safe condition,—not only to the passengers, but to those rightfully near to and liable to be injured by its being operated when in an unsafe condition. By slight attention this danger could have been seen and avoided. Appellant, by the contract, for the purpose of running into and out of the depot, made this portion of the track its own, and must be responsible for all injuries resulting from negligence in keeping or permitting it to be in an unsafe condition. Had this part of the road being used by appellant in fact belonged to it, and been operated by its servants, no one, we apprehend, would claim appellant would not be liable. Then, when it acquired the right to so use the road, and its use to be controlled by the road-master, and obstructed by him, or those under him, appellant must be equally liable. By the contract appellant yielded, instead of retaining, the necessary control to secure the safety of other persons. Moreover, the servants of appellant in charge of the engine were not prohibited from seeing and removing the obstruction, and it was their duty to have seen and removed it."

This rule was further approved in the case of *Hannibal and St. Joseph R. R. Co. v. Martin,* 111 Ill. 219, wherein the court uses this language:

"The evidence shows that the train was made up by employees of the Chicago, Burlington and Quincy Railroad Company, and on its tracks, but for the appellant, and although a portion of the cars in the train came from the Chicago, Burlington and Quincy Company, and the balance came from the Wabash, St. Louis and Pacific Railway Company, when united they constituted appellant's train; and the use of the cars and tracks, and the labor in making up the train, were all to enable appellant to exercise its functions and perform its duties as a common carrier, and therefore the cars and tracks, and the servants employed in making up the train, so far as the rights of appellee are concerned, are to be regarded as the cars, tracks and servants of appellant. *Wabash, St. Louis and Pacific Ry. Co. v. Peyton,* 106 Ill. 534."

From the stipulation of the parties it appears that at the time of the accident, the C. & E. I. Ry. Co. was engaged in interstate commerce, and while so engaged used the switch yards of the C. & W. I. R. R. Co. Under the decisions of Courts of Appeal, the rule is that where the lessee is engaged in interstate commerce at the time of the negligent operation and accident, the lessor likewise will be held to be so engaged at that time, which rule is applicable in the instant case, and was applied in the following cases: *Lucas v. The Peoria & Eastern Ry. Co.,* 171 Ill. App. 1; *Arens v. The Baltimore & Ohio Chicago Terminal R. Co.,* 213 Ill. App. 273; *Lloyd v. Southern Ry. Co.,* 166 N. C. 24; *North Carolina R. Co. v. Zachary,* 232 U. S. 248.

In considering the contention that the court at the close of the plaintiff's case erred in not instructing the jury to find the defendants not guilty, this court will consider this motion in the nature of a demurrer to the evidence, and all reasonable inferences arising from the evidence will be taken most strongly in favor of the plaintiff, *McCune v. Reynolds,* 288 Ill. 188, having

in mind that an employer is not held to an absolute responsibility to furnish a safe place to work, but is charged with the duty of exercising reasonable care to that end.

From the fact that the switch tender signaled Armstrong to back his train into the yard, it may be inferred that the yard was reasonably safe for switching operations, especially where the evidence shows that it was the custom and practice to brake or block cars that were placed on storage tracks, which practice was evidenced by the bulletins issued by the superintendent to that effect.

It is also a part of the evidence that when the switching operation takes place in the nighttime, it is directed by the order of the switch tender in the absence of the yardmaster, or clerk of the yard; that on the night of this fatal accident the yardmaster, or clerk, was not present, and it would be but a reasonable inference to conclude from the evidence that Armstrong was directed to place 12 cars on the track in question. It was rather unusual that the choice of a switch track—one of the 23 tracks used for that purpose—was left to this conductor on the night in question.

The defendants criticise the plaintiff's suggestion that if the switch track would accommodate only 62 cars, and that on the night of the accident 58 cars were on this track, by adding the 12 cars from Armstrong's train and a gap of 4 car lengths between the 56 cars and the 12 cars switched onto the track, it would necessarily follow that 10 cars would be upon the running track, and contend that the plaintiff did not take into consideration the lead track, the length of which is not in evidence, which track connects with the storage track at the south end, and also with the running track under the viaduct where the accident occurred. It was a question for the jury to determine

from the facts under the instructions of the court, and having done so, we are unable to say, as a matter of law, that the plaintiff is not entitled to recover from the defendants upon the facts established by the evidence under the pleadings in this case.

It is contended by the defendants that the court erred in allowing the witness C. J. Hochstadter to testify that Armstrong was careful in his habits, and assign as a reason that there were witnesses who saw sufficient of the accident to preclude the introduction of such evidence. The rule is that where there are no eyewitnesses to an accident causing death, it is proper to introduce testimony as to the habits of the deceased, and that he was a careful man, as tending to establish that the deceased, prior to his death, exercised care on the occasion of the accident.

In the present case the engineer testified fully about the accident, and although he did not actually see just what Armstrong was doing at the time he was struck, he did say that Armstrong got on the caboose of the train shortly before the accident and that he did not see him again until after the accident happened. Under the rule above stated, we believe there was no error in admitting this evidence of the witness Hochstadter. Illustrative of the rule that evidence of careful habits, in cases of this kind, is admissible, are the following cases: *Chicago and Alton Ry. Co. v. Wilson*, 225 Ill. 50; *O'Donnell v. The Riter-Conley Mfg. Co.*, 172 Ill. App. 601; *Greene v. Fish Furniture Co.*, 272 Ill. 148.

Complaint is made that the court erred in allowing the witness Schnackenberg to express an opinion as to whether the cars on the storage track would have rolled onto the running track if the brakes had been set on any of the cars. It is a matter of common knowledge that brakes set upon cars or automobiles will impede the free movement of the cars, and a jury

is able to judge whether a car will move when braked. The error, if any, was harmless, as the evidence was not in conflict with common knowledge, *Williams v. Louis,* 204 Ill. App. 62, and will not justify a reversal on that ground.

Then again, the defendants complain that the witnesses Hochstadter and Lockwood were allowed to testify that they had received directions from the switch tender at the yards where to deliver cars at night. Plaintiff's reply to this contention is that the defendants cross-examined the witness Schnackenberg with reference to the duties of the switch tender, and he testified that the switch tender had nothing to do with the delivery track upon which the cars are set out. Following this, the evidence of the witnesses complained of was introduced. The rule on this question is that if one of the parties opens the way for the testimony objected to, there is no error in the admission of such evidence. *Illinois Steel Co. v. Wierzbicky,* 206 Ill. 201. Under this rule, the evidence objected to was not incompetent.

We are not convinced that the court erred in refusing to permit the defendants to prove by the witness Samuel I. Miller, engineer of the train crew as to whose duty it was to keep a lookout for obstructions as the train backed down the running track, for the reason that it would leave it to this witness to pass upon the question. Accordingly, the court did not err in its ruling.

We have considered the contention of the defendants that the trial court erred in denying the motion of the defendants to withdraw a juror upon the ground of alleged misconduct of plaintiff's attorney in making a remark during the examination of the witness Miller. We have reviewed the evidence and do not find that the remarks were of a prejudicial nature, or that there was any abuse by the court in the exercise of its discretion in denying such motion.

It is earnestly contended that the giving of the second and the fifth instructions for the plaintiff·was erroneous, for the reason that if the deceased was fatally injured because of the negligence of the servants of the C. & W. I. R. R. Co. without any negligence on the part of the C. & E. I. Ry. Co., he was not employed by the C. & W. I. R. R. Co. in interstate commerce. However, these instructions embody the plaintiff's theory based upon the pleadings and evidence, and, in our opinion, are not erroneous, but fully justified both by the pleadings and the evidence.

The refusal of the court to give defendants' tendered instructions numbered 1 and 2, was not error, nor were such instructions justified by the pleadings and the evidence. The point is made by defendants that unless the defendant C. & E. I. Ry. Co. was guilty of negligence, then before recovery could be had by the C. & W. I. R. R. Co. Armstrong must show that he was not guilty of contributory negligence. The theory of the plaintiff is that Armstrong was engaged in interstate commerce and was an employee of both defendants under the Federal Employers' Liability Act, and unless the evidence justified such theory, the plaintiff cannot recover. The refused instructions under the pleadings and the evidence in this case are confusing and misleading.

The court did not err in refusing to give defendants' tendered instruction 4, which is based upon the theory that assumption of risk does not apply in an action between persons not in the relation of master and servant, but that in such case contributory negligence is a bar to recovery. This theory is not warranted by the evidence in the instant case.

Refused instruction 5, which limits recovery to not more than $10,000 under the State law in case of death caused by injuries, has no application to the facts in this case, where, if liability is established, the amount

146

of damages will be controlled by the Federal Employ-ers' Liability Act.

Having considered the errors suggested by the de-fendants in this case, we find no such error as would justify a reversal. The judgment is accordingly affirmed.

*Judgment affirmed.*

FRIEND and WILSON, JJ., concur.